# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| U.S. NEUROSURGICAL, INC., a Delaware corporation, as successor in interest to GLOBAL HEALTH SYSTEMS, INC., a Delaware corporation, | ) ) ) ) ) | |
| Plaintiff, | ) ) | No. 02 C 4894 |
| vs. | ) ) | Judge Joan H. Lefkow |
| CITY OF CHICAGO, an Illinois municipal corporation, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This action arises from a contract between Global Health Systems, Inc. ("Global") and defendant City of Chicago ("the City") for the installation of a computer information system for the Chicago Department of Health ("CDOH"). Plaintiff, U.S. Neurosurgical, Inc. ("USN"), as the purported successor in interest to Global, has alleged, *inter alia*, that the City breached its contract with Global and seeks recovery of unpaid invoices in the total amount of $532,033.32, plus interest and costs.[1] The case was tried to the bench. Thereafter, counsel for each party submitted closing memoranda of fact and law. Based on the exhibits and testimony received in evidence and having considered the weight of the evidence and credibility of the witnesses and

---

[1] USN voluntarily dismissed without prejudice counts two (impairment of obligation of contract), three (deprivation of due process), four (violation of 42 U.S.C. § 1983), five (declaratory judgment), and six (judicial review of administrative decision/writ of *certiorari*) of the Amended Complaint. The City also voluntarily dismissed without prejudice its second, third, fourth, and fifth affirmative defenses relating to the voluntarily dismissed counts. *See* Stipulation of the Parties to Litigate the Breach of Contract Claim, Dkt. No. 47; Minute Order, Dkt. No. 48.

the post-trial submissions of counsel, the court hereby enters the following findings of fact and

conclusions of law.[2]


I.      **FINDINGS OF FACT**

        A.      **Background**

1.      USN is a Delaware corporation with its office and principal place of business in

        Rockville, Maryland.

2.      The City is an Illinois municipal corporation.

3.      At all relevant times, Global was a Delaware corporation with its principal place of

        business in Rockville, Maryland, and a wholly-owned subsidiary of GHS, Inc., a

        Delaware corporation.

4.      On June 30, 1995, Global entered into a written contract with the City in which Global

        agreed to design, install, implement, and manage a computer information system for the

        Chicago Department of Health ("CDOH") ("the contract").

5.      This computer system was known as the Global Health Information System, or "GHiS."

6.      The contract included a choice-of-law provision, which specified that the contract was

        governed as to performance and interpretation by the laws of Illinois.

7.      At all relevant times, Patrick Lenihan was a Deputy Commissioner for CDOH and was

        the executive project manager and key representative for the City for purposes of the

        contract.

<hr />

[2]The court has already established that it has jurisdiction under 28 U.S.C. § 1332(c). *See* Memorandum
Opinion and Order of March 31, 2005, at 1.

8. At the time the contract documents were executed, Alan Gold was the president and chief executive officer of Global and the president and chief executive officer of GHS, Inc. As of the time of trial, he was the president, chairman, and chief executive officer of USN.

**B. Asset Purchase Agreement between Global and Health Management Systems, Inc.**

9. Global began its work under the contract in 1995, which it continued until July 15, 1997.

10. On July 15, 1997, Global assigned its rights under the contract to Health Management Systems, Inc. ("HMS"), through an Asset Purchase Agreement dated March 10, 1997. In the Asset Purchase Agreement, Global sold substantially all of the assets and properties of its business to HMS.

11. In paragraph 1.01(c)(vii) of the Asset Purchase Agreement, Global and HMS agreed that those items listed on Schedule 1.01(c)(vii) to the agreement were specifically excluded from the Global assets transferred to HMS and were to be retained by Global. Among the items listed on this schedule were the unbilled accounts receivable relating to work performed by Global on or before July 14, 1997 for the CDOH project.

12. Paragraph 1.01(c)(ii) of the Asset Purchase Agreement provides that all accounts receivable of Global attributable to the business through the closing date were specifically excluded from the assets to be transferred and were retained by Global and Management. (The billed and unbilled accounts receivable are referred to hereafter collectively as "the Chicago receivables.")

13. Global notified the City of the asset purchase transaction between Global and HMS on March 11, 1997. Global requested the City's consent to the assignment and transfer of

the contract to HMS, which the City gave on June 25, 1997 by executing an assignment form.

14. The transfer of assets and the contract from Global to HMS under the March 10, 1997 Asset Purchase Agreement became effective July 15, 1997 through a Bill of Sale, Assignment and Assumption Agreement.

15. As of July 15, 1997, the contract was assigned to HMS, and HMS assumed and agreed to perform and keep all covenants and agreements of Global. The City agreed to pay HMS for work performed after the effective date of the assignment.

16. After the assets of Global were sold to HMS, Global ceased doing business as a corporate entity and its operations continued under HMS with the same name, "Global Health Systems." Global continued to hold the Chicago receivables and certain other assets not relevant here.

17. Prior to the July 15, 1997 transaction, Global submitted invoices to the City, which the City has not paid. These invoices, which the court will refer to as "the billed receivables," were numbered 7339, 7503, 7621, 7631, 7733, 7781, 7813, 7815, 7857, 7863, 8131, and 8132. The total amount of these invoices is $32,033.35.

18. On September 11, 1997, Global submitted invoice number 8170 to the City. This invoice specified that $250,000 was due for "special programming" work, noting it was "reduced 50% for prompt payment." (This invoice represents the retained unbilled receivable of Finding of Fact No. 11 above.)

19. The City did not reject the invoice promptly after receiving it and did not pay the invoice.

**C.    Assignment and Assumption Agreement between GHS, Inc. and USN**

20.    GHS, Inc. ("GHS") during the relevant period was the holding company for both USN and Global.  (At one time, both USN and Global were wholly-owned subsidiaries of GHS.)  Alan Gold was the president and CEO of GHS.

21.    Within days after the closing of the Asset Purchase Agreement of July 15, 1997, Global's three directors, Alan Gold, Susan Greenwald Gold, and Howard Grunfeld,[3] met to discuss what to do with what remained of Global (hereafter "Old Global").

22.    During that meeting, the directors orally transferred 100 per cent of Old Global's assets, including the Chicago receivables, to GHS.  There is no document or other testimony in evidence that reflects a transfer of assets from Old Global to GHS.

23.    On May 27, 1999, GHS and USN entered into an Assignment and Assumption Agreement, which included a New York choice of law provision.  As part of this agreement, GHS assigned to USN "all accounts receivable of [GHS] and each of its subsidiaries arising through [May 27, 1999]."

24.    This  Assignment and Assumption Agreement did not include a schedule or description of the accounts receivable.  Nevertheless, the parties to the agreement understood that the only receivables GHS had to assign were the Chicago receivables.

25.    None of USN's annual reports or SEC filings from that time forward list the Chicago receivables as an asset.

---

[3]As of the time of trial, Howard Grunfeld was deceased.  Susan Greenwald Gold did not testify.

### D. Global's Contract with the City

26. Global's GHiS system used existing software that Global expected to modify to meet the specifications of its clients.

27. Generally, Global's service was to build an interface to render its GHiS system's database capable of receiving data exported from another system, such as CDOH's system. On top of the GHiS system's database is a layer of software that is built as an interface to bring the exported data into the database. To bring that data into the database, a programmer writes code to "massage" the data into a format to meet the specifications of the interface of the GHiS system.

28. The GHiS system then processed the data to perform the applications contained in its software modules.

29. In entering into the contract with Global, the City recognized that it needed a computerized system that integrated information collected at a number of separate clinics.

30. The Project Plan attached to the contract between Global and the City states that the GHiS system would be used to implement clinical case management and billing functions for the CDOH.

31. According to the contract, the GHiS system would be the City's means of collecting, automating, manipulating, analyzing, and displaying data.

32.    The Project Plan states, in part:

Current configuration calls for keyed data entry except where noted.  [Global] will assist CDOH in assessing the feasibility of alternative data entry modes, such as scannable forms and bar coding, and will incorporate changes in hardware and GHiS where alternative data entry is found to be more appropriate by CDOH. Any special hardware required for these alternative data entry methods not otherwise identified in the Hardware Deliverables Section of the Project Plan or agreed to in substitution may require added cost for CDOH.

33.    The Project Plan specifies that data entry is a CDOH task.

34.    Pursuant to the Project Plan, the GHiS system could receive data through key entry, interfacing with another system, or a feasible alternative data entry mode, such as scannable forms and bar coding.

35.    The Project Plan states, at page 3, "Unless specifically noted to the contrary, all provisions called for in this project plan are included in the contracted price."

36.    Section 4.6 of the contract states:

From time to time the City may request [Global] to perform such Additional Services such [sic] as data entry or other consulting, which are not set forth in the Project Plan (Exhibit A).  Charges for Additional Services shall be [Global]'s then current rates, to be quoted at the start of any work agreed to by the parties, in accordance with the provisions of Section 4.7 "Procedures for Ordering Additional Services" herein.

37.    Section 4.7 establishes the procedures for ordering these additional services.  It states:

1.    When it is determined that Additional Services will be required, CDOH will request [Global] to issue, within five days of notice, a written work plan and cost estimate with a detailed description of the project, objectives or work activities required.  The work plan and cost estimate, which [Global] will provide the City at no cost, will describe the proposed tasks which will comprise the Additional Services, along with estimates of hours and costs to complete them, the time period for completion (start/end date), and the specific hours and staff resources proposed for performing each task.

7

2. CDOH, [Global] and the City of Chicago Department of Management Information Systems (MIS), will jointly review the estimate and, if needed, discuss revisions to the original estimate necessary for it to satisfy the technical, financial, or personnel requirements of CDOH. When agreement is reached, [Global]will revise the estimate accordingly and prepare a final detailed quotation, which will be called a "Work Order."

3. The Consultant shall sign the Work Order and send it to CDOH. CDOH will sign the work order and send it to MIS requesting Information Technology Strategy Committee approval. When that is obtained, CDOH may request the Department of Purchases, Contracts and Supplies to process an amendment to the Contact which corresponds to the Work Order. This procedure must be in accordance with the provisions of Section 5.6 "Modifications and Amendments" herein.

38. Section 5.6 of the contract specifies that no changes to the contract are valid unless in writing and signed by the parties, or their respective successors and assigns.

**E.      Scanning Function for the STD Clinics**

39. At the time Global and the City entered into the contract, the GHiS system did not have scanning capabilities or include a scanning function. Rather, data were entered into the GHiS system by key punch or data entry at terminals.

40. Global represented to Patrick Lenihan prior to entering into the Global contract, however, that the GHiS system had the capability of receiving scanned data.

41. CDOH determined that it wanted the GHiS system to include a scanning function for the STD clinics.

42. Initially, at the request of Alan Gold, Bill Hartman, Global's software developer, visited CDOH's STD clinics and performed an assessment of the clinics' existing computerized system. Hartman wrote an assessment of his visit.

43. At that time, the STD clinics had an existing scanning interface which allowed the clinics to take completed forms, such as an encounter form describing a patient's visit to the clinic, and import the form into a computer so that the information on the form would become data stored in the computer's database.

44. Bill Hartman understood from the beginning that the STD clinics wanted the new system to have scanning; indeed, he understood that it was not acceptable for the STD clinics to have a system that did not include scanning.

45. CDOH contemplated that the STD clinics' staff would complete visit encounter or "VE" forms for patient visits to a clinic. The VE forms were to be scanned, and a data stream would be captured.

46. Next, the data stream would be formatted to meet specifications of the GHiS system in order to process the data further.

47. That data would then be pushed into the GHiS system, which would absorb the stream of validated data elements into its database. The development of this "interface" that would transfer CDOH's data into the Global system was to be a joint effort between Global and CDOH.

48. On the recommendation of Van Zollweg, a vice president at Global, CDOH selected Teleform, a scanning software that performs data entry, to accomplish the scanning.[4]

---

[4] Alan Gold testified that the City initiated use of Teleform. Hartman and CDOH's project manager, Patrick Lenihan, testified that Van Zollweg recommended Burt Quint, who was associated with the Teleform software, to Lenihan (Hartman testimony, Tr. 51). The court credits the testimony of Hartman and Lenihan. Even if Lenihan recommended and selected Teleform, however, the decision in this case would be the same.

49. Global ordered the Teleform software and submitted a Global invoice to Patrick Lenihan. The City paid Global's invoice for the software and Global paid the vendor.

50. Teleform allows a progammer to define an input scan form, the edits or checks that should occur, and the file that is produced from the scanned data.

51. Burt Quint was hired as a subcontractor to develop a form and verification logic so that a scanner would capture the data from Teleform, validate the data, and pass the data to the GHiS system in a format that met the specifications of the GHiS system. Quint worked on scan forms for both the STD clinics and pediatric clinics.

52. Before the GHiS system could receive scanned data from Teleform, the data that Teleform produced needed to be validated. To validate the data, programmers examined the data produced by Teleform to detect inconsistences. If inconsistences existed, the programmers performed edits to correct the problem.

53. After the scanned data were validated, the data exported from Teleform needed to be formatted in a "flat file" that met the specifications of the GHiS system.[5]

54. Barbara Johnson, a Global programmer, developed file layout specifications for the output file for the scanning. The purpose of the specifications was to define what the data had to look like in order for the GHiS system to accept and process the data.

55. The scanning operation was supposed to produce an output, or export, file as a stream of validated data elements that would constitute the record.

56. Burt Quint never produced an export file that met Global's specifications for the GHiS system. As a result, Global took over the edit logic task, *i.e.*, the task of validating the

_____

[5]A flat file is a serial file that moves data between separate systems.

data produced by Teleform and making edits to correct inconsistencies in the data as

necessary.  Global employee Bill Hartman was primarily responsible for this task.

57.	Bill Hartman and Global then developed capabilities within the GHiS system to accept

the record from Teleform, to perform second-level editing within the GHiS system to

detect errors, to report errors to the clinic user, and to accept user correction to the record.

58.	Ultimately, the scanning function worked.


**II.	CONCLUSIONS OF LAW**

The primary focus of USN's breach of contract claim is the recovery of

compensation for programming work done by Global in connection with the implementation of

the scanning operation at the CDOH's STD clinics.  USN seeks $500,000 for this work on the

basis of an alleged agreement with the City for additional services for which Global sent the City

a discounted invoice, No. 8170, in the amount of $250,000.  Plaintiff's theory of the case is that

(1) the contract, interpreted in context of the request for proposal, representations made by the

parties prior to execution of the contract, and the implementation of the contract and

accompanying Project Plan, demonstrate that the work Global performed in implementing

CDOH's decision to collect data through a scanning (rather than keyed data entry) method was

extra work outside the contract; and (2) the City agreed to pay for that extra work with non-

contract funds.  The City's agreement to pay with non-contract funds, according to USN, was an

oral agreement between Patrick Lenihan and Alan Gold, in which Lenihan agreed to get whatever

additional money was needed to get the project done.

The City's defense theory rests on four arguments: (1) that USN lacks standing to assert the claim because USN does not own the Chicago receivables; (2) the work for which USN claims payment was part of the contract, not extra work; (3) even if it was extra work, USN cannot establish that failure to meet the additional work provisions of the contract was waived by Lenihan, or that any purported waiver could bind the City to payment; and (4) that even if the City loses on (1) - (3), USN cannot prove the amount due.

In addition, USN contends that it has established an account stated for invoices totaling $32,033.32 for billed receivables. The City denies this claim as well.

### A. USN Has Standing To Sue

At the threshold, the City contends that USN has no standing to pursue this action because it does not own the Chicago receivables. This court previously considered this issue on the City's motion for summary judgment and concluded (1) that the City had the burden to prove at trial that Global did not retain the Chicago receivables in the July 15, 1997 Asset Purchase Agreement with HMS; (2) that if Global did retain the receivables, the question had to be resolved whether Global validly transferred its assets, including the Chicago receivables, to its parent GHS shortly after the Asset Purchase Agreement closed; and (3) if the receivables were transferred, whether GHS's transfer of the receivables to USN in the Assignment and Assumption Agreement of May 27, 1999 was valid. If all of these facts are found in favor of USN, then USN has standing.

On the first issue, the City apparently concedes that the Chicago receivables were not assigned to HMS, and the court has found at paragraphs 11 and 12 that the Asset Purchase Agreement specifically excluded the Chicago receivables. Because the Assignment and Assumption Agreement between GHS and USN included the receivables of GHS and each of its subsidiaries, it is apparent that whether the oral transfer of assets from Old Global to GHS was valid is immaterial because Global, another subsidiary, also transferred its receivables in the Assignment and Assumption Agreement. Therefore, USN does have standing to collect the Chicago receivables.

### B.      The Contract is Unambiguous

This court has previously determined that Illinois law governs interpretation of the contract between the City and Global. Mem. Op. and Order of March 21, 2006, at 10-11, Dkt. No. 119. To determine whether a contract is unambiguous, the court looks to the language of the document memorializing the contract, usually referred to as "the contract." Illinois courts endeavor to construe contracts as a whole, giving meaning to each provision. *Interim Health Care of N. Ill., Inc.* v. *Interim Health Care, Inc.*, 225 F.3d 876, 879 (7th Cir. 2000). Under Illinois law, clear and unambiguous terms in a contract are given their "ordinary and natural meaning." *See Emergency Med. Care, Inc.* v. *Marion Mem'l Hosp.*, 94 F.3d 1059, 1061 (7th Cir. 1996). "Although words should be given their ordinary and accepted meaning, they must also be viewed in context, and the contract must be considered as a whole in order to ascertain the parties' intent." *Util. Audit, Inc.* v. *Horace Mann Serv. Corp.*, 383 F.3d 683, 687 (7th Cir. 2004) (citing *Trade Center* v. *Dominick's Finer Foods*, 711 N.E.2d 333, 335, 304 Ill. App. 3d 931, 238Ill. Dec. 230 (Ill. App. Ct. 1st Dist. 1999)).

Ambiguity exists in a contract if the contract language is "reasonably or fairly susceptible of more than one construction." *A.A. Conte, Inc.* v. *Campbell-Lowrie-Lautermilch Corp.*, 477 N.E.2d 30, 33, 132 Ill. App. 3d 325, 87 Ill. Dec. 429 (Ill. App. Ct. 1st Dist. 1985). The fact that parties disagree as to the meaning of a contractual provision does not render the contract ambiguous. *Emergency Med. Care*, 94 F.3d at 1061. "Instead, 'when opposing parties agree that the document whose meaning they dispute is not ambiguous, all they mean is that they are content to have its meaning determined without the help of any 'extrinsic' evidence.'" *Id.* (quoting *Matter of Envirodyne Indus., Inc.*, 29 F.3d 301, 304 (7th Cir. 1994)).

The disputed provision of the contract between the City and Global states:

> Current configuration calls for keyed data entry except where noted. [Global] will assist CDOH in assessing the feasibility of alternative data entry modes, such as scannable forms and bar coding, and will incorporate changes in hardware and GHiS where alternative data entry is found to be more appropriate by CDOH. Any special hardware required for these alternative data entry methods not otherwise identified in the Hardware Deliverables Section of the Project Plan or agreed to in substitution may require added cost for CDOH.

Defendant's Exhibit 1A (Project Plan), at 2. The Project Plan also states that data entry is a CDOH task, *id.*, and that "[u]nless specifically noted to the contrary, all provisions called for in [the] project plan are included in the contracted price." Project Plan, at 3.

Although both parties agree that the disputed provision is unambiguous, the parties dispute the meaning of the "will incorporate changes" provision. According to the City, the "will incorporate changes" provision means that, should CDOH decide that scannable data entry is appropriate, Global will incorporate the changes into hardware and the GHiS system. USN asserts that this provision is best explained as requiring Global "to receive scanned data." Both interpretations are consistent with the contract's language and with each other.

14

The clear, unambiguous language of the contract required Global to assist the CDOH in assessing whether alternative data entry methods, including scanning, were feasible. When and if the CDOH determined that it preferred an alternative data entry method to keyed data entry, the contract required that Global alter the GHiS system and hardware as necessary to render the GHiS system capable of receiving the data. In that regard, the programming work performed by Global to tailor the GHiS system to receive scanned data was covered by the contract price.

To the extent that USN argues that "will incorporate changes" is ambiguous, the argument is addressed below in a discussion of the respective understandings of the parties regarding performance of this term.

### C. The Work Was Not Outside the Scope of the Contract.

USN contends that the programming work performed by Global was not part of tailoring GHiS to receive CDOH's scanned data, on the basis that scanning was CDOH's obligation under the contract. The court finds that the work is not fairly characterized as scanning. Although data entry was plainly CDOH's obligation, the task at hand was not data entry. Indeed, in an instance where the City wanted Global to do data entry, the parties entered into an agreement to allow payment for additional services as provided in paragraphs 4.6 and 4.7 of the contract.

USN also argues that the City understood the work to be outside the contract because Teleform and the work of independent contractors Burt Quint and Margie Marti were paid for by the City. USN asks the court to infer that Quint and Marti were therefore performing non-contract work. The evidence does not lead to that conclusion. First, Howard Grunfeld, Global's chief financial officer, testified that Quint and Murphy were retained by Global to work exclusively on the CDOH contract. Grunfeld dep. in evidence, at 13. Moreover, the contract

was structured as a three-year facilities management agreement with specified installment payments. The court infers from the evidence that Lenihan's accounting for payment of these individuals was under contract monies. The consultants billed Global and Global invoiced the City for the funds. Lenihan approved the invoice and authorized payment to Global. The City paid Global and Global paid the contractors. Grunfeld testified that he had to obtain approval of all payments from Lenihan before he could pay Global's invoices. Grunfeld dep., at 27-29. All the evidence indicates that this was the regular procedure for all disbursements, the exception being Bill Murphy where Lenihan informed Global that non-contract funds were being added for this purpose.[6]

### D.    The City Did Not Agree To Modify The Contract To Pay Global For Incorporating Changes to GHiS.

USN makes a variety of arguments in support of its position that the City either explicitly or tacitly agreed to pay extra for modifying GHiS or for creating an export file.

Before the contract was signed, in approximately mid-May 1995, Gold testified that he spoke with Lenihan several times about the City's desire to use scanned data for its output file. Gold says he warned Lenihan that Global could only do a feasibility study and, once that was

---

[6]Hartman and Lenihan have different views of who was at fault for Quint's failure to accomplish his assignment. There was "a lot of fingerpointing going on" at the time. Lenihan testimony, Tr. At 708. The fingerpointing likely had to do with who was responsible for the apparently joint decision to engage Quint. In any event, documents to, from and about Quint, such as Plaintiff's Exhibits V-25 and IV-39, do not establish which of the City or Global was responsible to perform Quint's assignment.

USN also relies on a memo from Lenihan dated May 22, 1995 in which he recommends to the deputy purchasing agent that a $300,000 performance bond from Global would be sufficient to cover the risk that "Global could not successfully modify [its 'off-the-shelf'] software package to CDOH's specific needs and the City would be required to call in outside help to finish the project." Lenihan estimated 1,000 - 2,000 hours at a "high rate" of $150 an hour, recommending that $300,000 would be an adequate bond. This evidence is not relevant because it is an estimate of the cost of substituting for Global's non-performance of its contract obligation to modify GHiS, not an estimate of the cost of the City's non-performance or the value of the alleged extra work. *See* Plaintiff's Exhibit II-40.

done and it was determined that scanning was feasible, they would have to come to terms on a price for it. Lenihan then assured him that there would be money when needed. Gold testified that another conversation of this sort occurred at or about the time Burt Quint was fired. Gold stated that he told Lenihan that if Global did Quint's work it would be extra work outside the contract. Lenihan further assured him he wanted the job done and he could get the money. Lenihan denies that he made that representation.

The court does not necessarily disbelieve either witness's selective memory, as to the second conversation at least. Nevertheless, the evidence shows that Gold never made a proposal for additional services in accordance with sections 4.6 and 4.7 of the contract (see Findings of Fact 36-37), which he had done on other occasions and which he certainly understood to be necessary. He excuses that omission by stating that he could not have possibly quantified at that time how much work would be entailed. This is implausible where Global priced the entire project when it bid for it and priced another extra work project for keyed data entry. Neither did Gold direct Global employees to keep track of the time they were spending on the output file, which might evidence some oral agreement to agree in the future about extra work. Whatever Gold's private expectation might have been, he did not act on that expectation by submitting a proposal for additional services. The only evidence of it is the invoice issued long after all the work was done.

The heart of the matter appears to be that Global, in its eagerness to make the contract with the City, was overly optimistic about its ability to adapt GHiS to scanned data.[7] While

---

[7] In this regard, the court does not credit Gold's testimony that he warned Lenihan during negotiations that any implementation of scanning would cost the City more money.

Global normally anticipated that tailoring its software to fit the client's requirements would require minimal effort, this first venture into adapting to scannable data was far more difficult and time-consuming than anticipated. Certainly, Global would not have needed to engage in as extensive programming of GHiS to render it capable of receiving the export files from Teleform had such export files met Global's specifications. Nonetheless, the work performed by Global's programmers was necessary to render it capable of receiving the export files and falls within the broad "will incorporate changes in . . . GHiS" language of the Global contract.

### E.    Patrick Lenihan's Authority

Even if there was an oral agreement between Lenihan and Gold for the claimed extra work, USN does not dispute the City's assertion that Lenihan lacked the authority to bind the City to a contract with USN or its predecessor. *See* 65 Ill. Comp. Stat. 5/8-10-16 (2003) ("[T]he [municipal] purchasing agent shall . . . constitute the sole agent of the municipality in contracting for labor, materials, services or work . . . ."). USN argues, however, that the City expressly delegated authority to Lenihan in the contract between the City and Global to make changes to the contract and that Lenihan orally modified the existing written contract rather than entering into a separate oral contract.

The City's power to contract is limited by law. *Chicago Food Mgmt.* v. *City of Chicago*, 516 N.E.2d 880, 884, 163 Ill. App. 3d 638, 114 Ill. Dec. 725 (Ill. App. Ct. 1st Dist. 1987). "Only the corporate authorities have the power to bind the City in a contract unless that power is expressly delegated to another." *Id.* Article 8, division 10, of the Illinois Municipal Code governs municipal purchasing and public works contracts. *McMahon* v. *City of Chicago*, 789 N.E.2d 347, 350, 339 Ill. App. 3d 41, 273 Ill. Dec. 447 (Ill. App. Ct. 1st Dist. 2003) (citing

65 Ill. Comp. Stat. 5/8-10-1 *et seq.*).  The Illinois Municipal Code sets forth the limitations on the

ability of municipal employees to enter into contracts:

> No department, office, institution, commission, board, agency or instrumentality
> of any such municipality, or any officer or employe[e] thereof, shall be
> empowered to execute any purchase order or contract [involving amounts in
> excess of $10,000] except as herein specifically authorized, but all such purchase
> orders or contracts shall be executed by the purchasing agent in conformity with
> [this statute].

*Id.* (quoting 65 Ill. Comp. Stat. 5/8-10-18 (2000)).  The Chicago Municipal Code establishes that

the City's chief procurement officer has the powers and duties mandated by the Illinois

Municipal Code.  *Id.* (citing Municipal Code of Chicago § 2-92-010 (amended Sept. 4, 2002)).

There is no dispute that Lenihan was not the City's chief procurement officer and, as

such, lacked the authority to enter into a contract with Global.  Further, even the City's chief

procurement officer lacks the authority to enter into an oral contract.  *See* Municipal Code of

Chicago § 2-92-050 (requiring written contracts: "No contract shall be binding upon the city . . .

until the contract, in the requisite number of copies, has been duly executed.").  And "[a]

prospective contractor who deals with a municipal corporation is presumed to know the

limitations of the power of the city officials to enter into contracts."  *McMahon*, 789 N.E.2d at

350 (citing *Ad-Ex, Inc.* v. *City of Chicago*, 565 N.E.2d 669, 673, 207 Ill. App. 3d 163, 152 Ill.

Dec. 136 (Ill. App. Ct. 1st Dist. 1990)).

In arguing that the City expressly delegated the authority to orally modify the contract

between the City and USN to Lenihan, USN does not cite to any statutory authority authorizing

the deputy commissioner for planning to modify an existing contract, nor does USN city to any

authority establishing a distinction between an oral contract and an oral modification to an

existing contract. USN instead asserts that various provisions in the contract between the City

and Global gave Lenihan this authority. Again, however, USN fails to cite to any authority

allowing the City's chief procurement officer to delegate the responsibility of approving changes

to an existing contract to another City employee. Such a delegation of authority would be

contrary to the Illinois Municipal Code, as only the purchasing agent is authorized to enter into

contracts, 65 Ill. Comp. Stat. 5/8-10-18 (2000), and would render a contract *ultra vires*.[8]

"Municipalities are limited to only those powers which are given to them by constitution

and statute, and a municipality cannot be bound by a contract that does not comply with the

prescribed conditions for the exercise of power." *McMahon*, 789 N.E.2d at 350 (quoting *Ad-Ex*,

565 N.E.2d at 669). A contract that does not comply with the Illinois Municipal Code is "null

and void as to the municipality." *Id.* (quoting 65 Ill. Comp. Stat. 5/8-10-21 (2000)). Because

Lenihan was not empowered to orally modify the contract between the City and Global, any oral

agreement between Lenihan and Gold is "null and void" as to the City. *See Denton Enterprises,*

*Inc.* v. *Ill. State Toll Highway Authority*, 396 N.E.2d 34, 39, 77 Ill. App. 3d 495 (Ill. App. Ct. 1st

Dist. 1979) (change in highway construction contract agreed to by contractors and Toll Highway

Authority without the Toll Highway Authority having obtained approval by the Attorney

General, as required by statute, was unenforceable). Additionally, because any oral agreement

between Lenihan and Gold was *ultra vires*, the City's payment of monies, if any, beyond the

contract price to Global did not render the oral agreement valid. *Stahelin* v. *Bd. of Educ., School*

---

[8] USN's contention that the oral agreement for extra work was beyond the scope of the contract also belies its assertion that the oral agreement was a modification of the existing contract. The oral agreement instead is better characterized as a separate contract that related to an earlier contract. This characterization does not affect the court's analysis, however.

*Dist. No. 4, DuPage County,* 230 N.E.2d 465, 472, 87 Ill. App. 2d 28 (Ill. App. Ct. 2ⁿᵈ Dist. 1967) ("Contracts entered into by a municipality which are expressly prohibited by law, and which under no circumstances can be entered into, are void and *ultra vires*. They may not be rendered valid thereafter by estoppel or ratification on the part of the municipality.").

Even if Global's position is accepted, that the City expressly delegated authority to Lenihan in the contract between the City and Global and that delegation of authority was proper, the contract does not go so far as to authorize Lenihan to orally modify the contract to perform work beyond the scope of the project plan. The contract between the City and Global provided that Lenihan, as Deputy Commissioner for Planning, would "serve as the executive project manager." Project Plan, at 15. His duties included "(a) approval of all changes to the project plans, including configuration, functionality, costs, staffing and scheduling; (b) final signoff/approval for key project documents; (c) chairing the project steering committee; and (d) budget authorization power for all project disbursements." *Id.* If this clause granting Lenihan authority to approve changes to the project plans were read as giving him broader authority to enter into oral agreements for additional work, it would negate that provision of the contract expressly precluding such a result. Such a strained reading is not consistent with the principle that the contract must be considered as a whole in order to ascertain the parties' intent.

Sections 4.6 and 4.7 of the contract relate to additional services. Section 4.6 states, in part, "From time to time the City may request [Global] to perform such Additional Services such [sic] as data entry or other consulting, which are not set forth in the Project Plan (Exhibit A)." Section 4.7 then establishes the procedures for ordering these additional services. Section 4.7 states:

1.  When it is determined that Additional Services will be required, CDOH will request [Global] to issue, within five days of notice, a written work plan and cost estimate with a detailed description of the project, objectives or work activities required.  The work plan and cost estimate, which [Global] will provide the City at no cost, will describe the proposed tasks which will comprise the Additional Services, along with estimates of hours and costs to complete them, the time period for completion (start/end date), and the specific hours and staff resources proposed for performing each task.

2.  CDOH, [Global] and the City of Chicago Department of Management Information Systems (MIS), will jointly review the estimate and, if needed, discuss revisions to the original estimate necessary for it to satisfy the technical, financial, or personnel requirements of CDOH.  When agreement is reached, [Global] will revise the estimate accordingly and prepare a final detailed quotation, which will be called a "Work Order".

3.  The Consultant shall sign the Work Order and send it to CDOH.  CDOH will sign the work order and send it to MIS requesting Information Technology Strategy Committee approval.  When that is obtained, CDOH may request the Department of Purchases, Contracts and Supplies to process an amendment to the Contract which corresponds to the Work Order.  This procedure must be in accordance with the provisions of Section 5.6 "Modifications and Amendments" herein.

Defendant's Exhibit 1.  Section 5.6 also requires that no changes to the contract are valid unless in writing and signed by the parties, or their respective successors and assigns.  Thus, while the contract between the City and Global contemplated that the City may require additional services, the contract set forth detailed procedures that the parties must have followed in order to make valid changes to the contract, including requiring that any such changes be in writing.  Any additional services required the approval of the Information Technology Strategy Committee of the City's Department of Management Information Systems.  Accordingly, the contract did not authorize Lenihan to enter into an oral agreement to modify the contract.

### F.      Construction-Type Contracts

USN asserts, however, that the general principles of municipal contracting law are inapplicable here because the Global contract was the equivalent of a change order under a construction contract.   USN cites to *McGovern* v. *City of Chicago*, 118 N.E. 3, 281 Ill. 264, 280 (1917), *Great Lakes Dredge & Dock Co.* v. *City of Chicago*, 188 N.E. 196, 353 Ill. 614 (1933), and *Stahelin* v. *Bd. of Educ., School Dist. No. 4, DuPage County*, 230 N.E.2d 465, 87 Ill. App. 2d 28 (Ill. App. Ct. 2nd Dist. 1967), as expressly recognizing that statutory municipal contracting requirements do not preclude informal changes to construction contracts for additions and extras. Both *McGovern* and *Great Lakes* pre-date the enactment of the laws set out above.   Resting solely on interpretation of the contracts at issue, these cases applied estoppel doctrine in holding that a municipality that has accepted the benefit of a performed contract was obligated to pay the contractor.   Here, however, the statutory limit on Lenihan's authority  forecloses this result as any such agreement would be *ultra vires* and therefore void.

As recognized by *Lindahl* v. *City of Des Plaines*, which USN cites, "[c]onstruction contracts [between a municipality and contractor] are unique because construction work is uncertain in that after parties involved have agreed upon a price for the construction work, costs may escalate during construction and the contractor may encounter unforeseen circumstances which make the performance of the construction project more costly."  568 N.E.2d 1306, 1314, 210 Ill. App. 3d 281, 154 Ill. Dec. 857 (Ill. App. Ct. 1st Dist. 1991).   In *Lindahl*, the plaintiff sought to enforce a contract with a municipality.   The plaintiff claimed this his supervisor had agreed to pay the plaintiff overtime pay.   568 N.E.2d at 1315.   The court determined that no contract existed because the municipality had made no appropriation for additional compensation

for overtime. 568 N.E.2d at 1314-15.  The court held that the plaintiff's agreement with his supervisor for overtime pay was null and void and that the plaintiff was presumed to have known the limitations of the city defendant's liability for any contract which its officials attempted to enter into with the plaintiff.  568 N.E.2d at 1315.  Additionally, the court in *Lindahl* found inappropriate the plaintiff's reliance on *McGovern* and *Great Lakes Dredge & Dock Co.* because the defendants in those cases made legislative appropriations to pay the plaintiffs and because of the unique nature of construction contracts.  568 N.E.2d at 1313-14.  The court, therefore, relied on available precedent involving employment contracts rather than construction contracts. 568 N.E.2d at 1314.

This court similarly concludes that *McGovern*, *Great Lakes Dredge & Dock Co.*, and *Stahelin* are inapposite to the present matter.  In each of these cases, the municipality had the power to enter into the contract at issue but a portion of the contract was beyond its power or the power was exercised irregularly.  Here, the City is barred by statute from entering into contracts that are not executed by the chief procurement officer.  And the unique challenges presented with construction contracts are not at issue.  Global was implementing the installation of computer hardware and software.  Although unforeseen circumstances may arise in any contractual situation, those that arose in the present matter were not akin to the unforeseen difficulties and expenses that can arise when repairing pavement (*McGovern*), straightening a branch of a river (*Great Lakes Dredge & Dock Co.*), or building a school (*Stahelin*).  The court is therefore

persuaded that Illinois courts would apply general principles of statutory municipal contracting law, rather than dipping into construction law, to resolve this contract dispute.[9]

### G. The claim for payment of invoices other than No. 8170 as an account stated was not proved at trial.

USN's complaint and motion for summary judgment included a claim for account stated as to the billed receivables. This court's rulings on motions in limine allowed this claim to proceed to trial. Although USN does not even argue this issue in its brief and it could be deemed waived, the issue can be readily resolved as unproved.

"An account stated is an agreement between the parties who previously engaged in transactions that the account representing those transactions is true and the balance stated is correct, together with a promise for payment of the balance." *Dreyer Medical Clinic, S.C.* v. *Corral*, 591 N.E.2d 111, 114, 227 Ill. App. 3d 221, 169 Ill. Dec. 231 (Ill. App. Ct. 2nd Dist. 1992) (citing *Toth* v. *Mansell*, 566 N.E.2d 730, 207 Ill. App. 3d 665, 152 Ill. Dec. 853 (Ill. App. Ct. 1st Dist. 1990)). Whether an account stated exists is a question of fact. *Id.* (citing *McHugh* v. *Olsen*, 545 N.E.2d 379, 189 Ill. App. 3d 508, 136 Ill. Dec. 855 (Ill. App. Ct. 1st Dist. 1989)). "An account stated is merely a form of proving damages for the breach of a promise to pay on a contract." *Id.*

---

[9]USN in its post-trial memorandum, page 10, makes several one-sentence statements of position without argument or reference to the record. The court disregards these statements. *See, e.g., 330 W. Hubbard Restaurant Corp.* v. *United States*, 203 F.3d 990, 997 (7th Cir. 2000) ("A party's failure to address or develop a claim in its opening brief constitutes a waiver of that claim, for it is not the obligation of this court to research and construct the legal arguments open to the parties, especially when they are represented by counsel. In order to develop a legal argument effectively, the facts at issue must be bolstered by relevant legal authority. . . .") (internal citations and quotations omitted).

Even if the court overlooks the fact that USN did not actually offer the invoices into evidence (there is no dispute of fact that Global submitted the invoices to the City for payment, however), USN has failed to meet its burden to prove that the balance stated is correct. The evidence demonstrates that Global submitted the invoices to Lenihan. Lenihan testified that he rejected the invoices as reflected on notations on each and returned them to Zollweg. Zollweg was not called to testify to the contrary. Thus Lenihan's testimony is uncontroverted. The court also credits Lenihan's credibility in this respect, as it is consistent with that of Grunfeld, the chief financial officer for Global, who testified that he spoke with Lenihan monthly, at least, regarding invoices and whether invoices reflected expenditures that were within the contract, Grunfeld dep., at 31-33, and he recalled that Zollweg and Lenihan met about unpaid invoices at least in September of 1996. Grunfeld Dep., at 42ff. Plainly, plaintiff has failed to carry its burden to establish an account stated by a preponderance of the evidence.

For these reasons, the claim for $32,033.32 for an account stated is denied.

## ORDER

The Clerk is directed to enter judgment in favor of defendant, The City of Chicago. Plaintiff, U.S. Neurosurgical, Inc. shall take nothing on its claims. This case is terminated.

ENTER:

Dated: August 24, 2007

_____
JOAN HUMPHREY LEFKOW
United States District Judge